UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ELTON MASON, an individual d/b/a WASHINGTON STATE TRUCKING, | CASE NO. C17-186 MJP |
| Plaintiff, | ORDER ON MOTION FOR SUMMARY JUDGMENT |
| v. | |
| STATE OF WASHINGTON, | |
| Defendants. | |

The above-entitled Court, having received and reviewed:

1. Defendants' Motion for Summary Judgment (Dkt. No. 106),

2. Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 111),

3. Defendants' Motion to Strike and Reply in Support of Motion for Summary Judgment (Dkt. No. 121),

4. Plaintiffs' Surreply Pursuant to LCR 7(g) (Dkt. No. 127),

all attached declarations and exhibits, and relevant portions of the record, and rules as follows:

IT IS ORDERED that the motion is GRANTED; Plaintiff's claims are DISMISSED with prejudice.

IT IS FURTHER ORDERED that Defendants' motion to strike is PARTIALLY GRANTED and PARTIALLY DENIED; the substantive portion of the motion to strike is contained in an attachment which exceeds the page limits allowed for a reply brief under the Local Rules. The Court indicates that it disregarded any evidence that constituted hearsay and disregarded any testimony which took the form of speculation or a conclusory legal opinion. The motion to strike evidence taken from an email produced after the Court announced discovery had closed is GRANTED.

**Background**

Plaintiff is an African-American male, sole owner of Washington State Trucking ("WST"), a trucking and excavating company certified as a Disadvantaged Business Enterprise ("DBE"). Dkt. No. 37, Amended Complaint ("AC") ¶¶ 1, 36. Defendant Seattle Tunnel Partners ("STP") was the design-build contractor for the Alaskan Way Viaduct ("AVW") project. AC ¶¶ 18, 19. Defendants Dragados USA, Inc. and Tutor Perini Corporation are "named" at AC ¶¶ 5 and 6, but no allegations against them appear in the amended complaint. Wherever "Defendant" is used in the singular, the reference is to Seattle Tunnel Partners.

The goal of the federally-funded AVW project was to build a new State Route 99 corridor through the City of Seattle. Washington State Department of Transportation ("WSDOT"), owner of the project, awarded the contract to STP. AC ¶19. That contract called for a goal of 8% of contracted work awarded to DBEs. AC ¶21. Believing that both STP and the State of Washington were in violation of their responsibilities under the contract and the law,

Plaintiff filed tort claims and Title VI complaints against Defendants as well as making informal complaints. AC ¶¶ 37-39.

The Federal Highway Administration ("FHWA") investigated Plaintiff's complaints and issued a report in November 2013, finding that both STP and WSDOT were in violation of federal regulations and the DBE program requirements. AC ¶¶ 44-45. Following the publication of that report, WSDOT issued a finding that STP was in breach of contract and needed to engage in commercially reasonable discussions with Plaintiff. AC ¶¶ 46-47.

Plaintiff alleges that, beginning in February of 2014, STP began a series of adverse actions against his company – including offering a "burdensome" 260-page contract for a reduced amount of work, conditioning Plaintiff's contract on the release of his claims against STP, refusing to consider bids for other jobs, and making false statements about Plaintiff in regards to lack of VIN numbers on some of his vehicles – which Plaintiff claims were done in retaliation for the complaints he filed. AC ¶¶ 60-61.

In March 2014, WSDOT and the FHWA entered into a Conciliation Agreement, under which WSDOT agreed to more intensively oversee STP's efforts to meet the 8% DBE goal, hire a DBE Program Administrator and Coordinator, and take whatever steps were appropriate should it appear that STP had failed to address the DBE compliance issues which the FHWA report had identified. AC ¶¶ 94-98.

Plaintiff initially filed a lawsuit against these corporate Defendants and a series of State Defendants alleging eleven separate causes of action under state and federal law. Dkt. No. 1. In response, Defendants filed motions to dismiss (Dkt. Nos. 21, 30), citing both statute of limitations issues and failure to state any claims upon which relief could be granted. The Court granted those motions, dismissing Plaintiff's claim for Title VI Discrimination with prejudice,

but dismissing the remainder of Plaintiff's claims without prejudice and with leave to amend. Dkt. No. 33, Order at 21 ("TSZ Order"). Plaintiff then filed an amended complaint, alleging claims for Title VI retaliation; retaliation, blacklisting, and discrimination under the Washington Law Against Discrimination (RCW 49.60 et seq.; "WLAD"); breach of contract; and violations of § 1981 and § 1985. In response to a second round of motions to dismiss, this Court dismissed (1) all the State Defendants and (2) all the claims except the state and federal retaliation claims. (Dkt. No. 55, Order on Motions to Dismiss.)

## Discussion

### I. Substantive merits of retaliation claims

The elements of a retaliation claim are well-known. A *prima facie* case of retaliation consists of Plaintiff's proof that (1) he engaged in a protected activity,[1] (2) that Defendants took "adverse action" against him, and (3) there is a "causal connection" between the protected activity and the adverse action. Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000); Peters v. Jenny, 327 F.3d 307, 320 (4th Cir. 2003)(applying retaliation claims to Title VI).

If Plaintiff can establish those factors, courts then employ a McDonnell Douglas burden-shifting analysis to the cause of action. The evidentiary burden shifts to Defendants, who must come forward with evidence of a legitimate, non-retaliatory reason for the adverse action(s). If Defendants can articulate a satisfactory and reasonable business explanation for their actions, it then becomes Plaintiff's burden to demonstrate that the stated reason is merely pretextual for the underlying retaliatory motive. McDonnell Douglas Corp. v. Green, 411 U.S. 702 (1973);

---

[1] Defendants concede the existence of this first element (Dkt. No. 106, Motion at 16), and the Court accepts as proven that Plaintiff engaged in a protected activity.

Rashdan v. Geissberger, 764 F.3d 1179, 1182 (9th Cir. 2017)(applying the McDonnell Douglas test to Title VI).

At the time that the Court dismissed all Plaintiff's claims except the retaliation claims, three allegations were cited which, if proven, could conceivably sustain a successful lawsuit for retaliation (i.e., might possibly constitute "adverse actions"[2]). The order on the motion to dismiss described these three allegations as follows:

1. In contract negotiations, STP allegedly reduced the scope of Plaintiff's work from an original bid of $415,800 to a contract that was ultimately worth only $184,470 to Plaintiff; and that, in the process of reducing the scope of the contracted job, STP made it more difficult for Plaintiff to complete the contracted work profitably because he was not going to get paid to break up pieces of concrete and steel which are harder to haul away when intact. AC ¶¶ 61-90.
2. STP allegedly failed to pay Plaintiff's wages on time, creating problems with his payroll and insurance. AC ¶ 61. STP calls this "entirely speculative" in its briefing (Dkt. No. 41, Mtn at 10), but that term does not apply [to these allegations]. The timing of payments to Plaintiff is a strictly factual matter and the impact on Plaintiff's business a matter which is susceptible of factual proof. Defendant argues that the claim is not "explained" anywhere else in the complaint but Plaintiff is not required (at the pleading stage) to explain it any further. It is clear enough what he is alleging, and the allegation is entirely factual. If true, it could be seen as evidence of retaliation.
3. STP is alleged to have falsely accused Plaintiff of using trucks he did not own with VIN numbers filed off to hinder identification of the true owner, which cost Plaintiff lost business opportunities. AC ¶ 61.

Dkt. No. 55, Order of Dismissal at 6-7. Defendants address the insufficiency of proof of each of these allegations, as well as providing legitimate business justifications for their conduct. The

---
[2] "Adverse actions" are actions which are "materially adverse" and would have "dissuaded a reasonable [subcontractor] from making or supporting a charge of discrimination." Burlington N. & Santa Fe Rwy. Co. v. White, 548 U.S. 53, 68 (2006).

Court examines them in turn, first under the lens of whether Plaintiff has established an "adverse action."

   A.  Reduction in scope and price

The analysis of this claim is extremely straightforward.  The AC states

> STP reduced the scope of Plaintiff's work down to hauling and disposing only, making performance of disposal more costly and logistically difficult because STP refused to pay to have the reinforced steel pieces broken down and required Plaintiff to somehow dispose of pieces no disposal yard would accept.

(AC at ¶61.)

Plaintiff initially bid the work at $415,800, which (factoring in his $402,432 estimate of costs), left him with a profit of approximately $13,000.  (Dkt. No. 107-4, Dec. of Bay, Ex. D, Mason Depo at 94:18-96:11.)  The contract was ultimately awarded for $184,470.  Plaintiff initially indicated that he did not know how much profit he made on that contract (Id. at 175:17-22); Defendants submitted a declaration averring that, at a meet and confer conference two weeks later, Plaintiff indicated that he made an approximately $64,000 profit on the work.  Nowhere in his responsive briefing does Plaintiff dispute that statement, or even respond to the argument.  The Court thus accepts as an undisputed material fact that Plaintiff made more money on the revised contract than he would have on the initial bid he offered.  It is the exact opposite of an "adverse action."

Plaintiff's lone remaining argument regarding the "adverse" nature of the contract he was awarded consists of his claim that Defendants attempted to coerce him into dropping any potential legal action he had against them in exchange for giving him the contract.  Plaintiff returns to this argument over and over and over again, and it is completely meritless. In the first

place, this allegation was already held insufficient as a matter of law by Judge Zilly earlier in the litigation:

> Plaintiff's allegation[] that he was subjected to retaliation when STP negotiated for the waiver provision . . . fail[s] to state a claim for relief… [T]he complaint is devoid of factual allegations from which the Court could plausibly infer that STP's negotiation of the waiver provision would deter a reasonable person from bringing or supporting a charge of discrimination when STP ultimately agreed to strike the waiver from the contract.

(TSZ Order at 11.) Plaintiff did not move for reconsideration of this order; it is the law of the case.

Even more damaging to Plaintiff's theory of the case is that Defendants not only agreed to a contract with no "waiver provision" in it, they signed a "non-standard contract addendum" stipulating that Plaintiff did not waive any claims by entering into the contract. (*See* Dkt. No. 108-4, Decl. of Dixon, Ex. D at 31-32; Dkt. No. 108-5, Ex. E at 6.) Again, Plaintiff makes no response to these facts in his argument, and it is hard to see how he could dispute them: they are in the contract that he signed. But there is no interpretation of these facts under which Defendants' behavior in the negotiation and award of this contract could be characterized as "adverse" to Plaintiff.

The Court therefore finds that Plaintiff has failed to prove that the offer, negotiation and awarding of his contract constituted "adverse action" on Defendants' part.

B. <u>Delays in payment</u>

Plaintiff's complaint alleges that "STP failed to pay Plaintiff's wages on time, causing Plaintiff problems with his payroll and insurance." (AC at ¶ 61.)

STP documents all the timely payments it made to Plaintiff: an initial $30,000 "mobilization payment" in August 2014 prior to the start of work, another check for $39,211.59 in October, and

checks for $70,000 and $39,894.73 (in October and November) following the completion of the work. (*See* Dkt. No. 106, Decl. of Dixon, Exs. K, L, N, O.) The only moneys temporarily withheld from payment were approximately $5,400, which included the amount still owed by Plaintiff's company to the union for its members' work on the Project. That final installment was paid to WST by two-party check on January 20, 2015 (which Defendants assert – and Plaintiff does not controvert – he did not cash until 2016). (Dkt. No. 109, Decl. of Streadbeck, Exs. I, J.)

There is abundant case law that late payments are not "adverse action" *per se*. *See, e.g.*, Solomon v. Philadelphia Newspapers, Inc., 2008 WL 2221856, at *17 (E.D.Pa. may 2,1 2008), *aff'd* 2009 WL 215430 (3rd Cir. 2009)(one-week delay in payment is not adverse action); and Fanning v. Potter, 2009 WL 497573, at 3 (E.D.Ark. Feb. 25, 2009), *aff'd*, 614 F.3d 845 *8th Cir. 2010)(delay in payment which did not cause loss of health insurance was trivial). Besides the delay in the final, $5400 payment, the only delay that Plaintiff documents is making a WST employee wait three hours to pick up a check. (Dkt. No. 112, Decl. of Mason at ¶ 53.) This kind of *de minimus* delay will not suffice to establish the existence of an "adverse action" so severe as to discourage a party from the exercise of his or her rights.

More tellingly (and fatal to Plaintiff's claim), he cites no evidence of any harm which he suffered as a result of the alleged delay. His complaint cites "problems with his payroll and insurance," but he comes forth with no factual proof that he was damaged in either of these areas. Plaintiff cannot rest on his allegations in response to summary judgment motion; he must come forward with proof of the injuries he claims. His briefing is devoid of declarations from any employee of late payment (or no payment) for work, and no testimony from Plaintiff that any insurance lapsed or he suffered any penalties for late payment of premiums. An action cannot be "adverse" in the absence of any injury.[3]

---

[3] Aside from the delay occasioned by the problem with Plaintiff's untimely union payment, there is additional argument on this issue from both sides relating to allegations by WST's former bookkeeper (she was fired after

C. "False accusations" of missing VIN numbers on WST trucks

Plaintiff's amended complaint alleges that "STP made false accusations to the Washington State Department of Transportation ("WSDOT") that Plaintiff did not own the trucks he was using and had filed off the VIN numbers from his trucks." (AC at ¶ 61.) In a series of allegations noteworthy for Plaintiff's lack of substantiation, this may be the most egregious.

First, Plaintiff presents no proof (1) that STP "accused" him of filing VIN numbers off the WST trucks or (2) that the VIN numbers were <u>not</u> illegible on some vehicles operated by his company. Defendant has photographic evidence of at least three trucks used by Plaintiff where the VIN numbers are unreadable because they appear to have been scratched out or spray-painted over (plus a fourth where the VIN number on the truck did not match the VIN number on the registration papers). (Decl. of Dixon, Ex. J.) Furthermore, Defendant presents proof that WSDOT was aware of this issue <u>prior</u> to the STP inspection which corroborated the problem (Dkt. No. 108-9, Decl. of Dixon, Ex. I); i.e., STP merely confirmed what WSDOT already knew.[4]

Plaintiff has no rebuttal to this evidence; he scarcely addresses the proof of the "obscured VIN numbers" in his response, except to claim that STP could have contacted him rather than WSDOT, and to argue that Defendant could still have counted him toward its DBE percentage[5] with "only one" non-conformind truck (ignoring that there were four problematic vehicles).

---

making the allegations) that Plaintiff was falsifying his certified payroll. (Motion at 12-13, Response at 19.) Plaintiff presents no evidence that the investigation of these allegations (which, even if they were ultimately not substantiated, the Court finds was a commercially reasonable thing for STP to do) caused any substantial delay in his payments; in fact, he does not controvert Defendants' evidence that at least one check (for $70,000) was issued to him while the investigation was pending. (Decl. of Dixon, Ex. N.) The Court considers the "falsified payroll" allegations to be a non-issue as regards these claims.

[4] Furthermore, a January 7, 2015 letter from WSDOT to STP makes it clear that Defendant simply reported the results of a site review to WSDOT ("The CUF review identified problems with Vehicle Identification Numbers (VIN) and missing truck registrations."). (Dkt. No. 108-9, Ex. I at 1.) There is no indication that STP "accused" WST of filing the VIN numbers off.

[5] STP, already under a microscope because of earlier violations, declined to count WST's work toward their "DBE requirement" because of the problems with the VIN numbers, the untimely satisfaction of the required union payment, and the allegation of false certification of the payroll claims. (*See* Motion at 12-13.)

ORDER ON MOTION FOR SUMMARY JUDGMENT - 9

And, other than to conclusorily and vaguely claim that the "false accusations" cost him future employment, Plaintiff comes forth with no proof of lost jobs or diminished reputation. With no proof that what Defendant observed and reported was false, and no evidence of actual harm stemming from this occurrence, Plaintiff has again failed to establish the existence of an "adverse action."

It is the conclusion of this Court that his inability to establish the existence of any "adverse action" taken against him by Defendants means that Plaintiff has not sustained his burden of establishing a *prima facie* case of retaliation. Nevertheless, in the interests of completeness and because this decision will result in the dismissal with prejudice of Plaintiff's entire case, the Court examines whether Defendants have satisfied their portion of the burden-shifting analysis.

**II.     Legitimate business justifications and proof of pretext**

Summary judgment for a defendant on a retaliation claim is proper when Defendant's proof "conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision or if the [plaintiff] created only a weak issue of fact as to whether the employer's reason was untrue." Heiner v Skagit County Emerg. Med. Servs. Comm'n, 2009 WL 2855722, at *4 (W.D.Wash. Aug. 31, 2009)(quoting Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 148 (2000)). Again, the Court will examine the proof in the context of the three allegations previously found to support a colorable claim of retaliation on Plaintiff's part.

  A. Contractual negotiations

STP has come forward with evidence that, prior entering into negotiations with WST, it had a bid from another DBE trucking firm on similar work which suggested the contract was worth about $115,000. (Decl. of Streadbeck, Ex. L.) Plaintiff's initial bid was nearly 3.5 times that amount. It is entirely reasonable for the company to negotiate for a lower price under those

circumstances. Plaintiff complains that the negotiation resulted in a reduced scope of work for him, but the reduction involved the means by which he initially proposed to demolish the concrete removed under the contract. As lead contractor on the Tunnel Project, STP understandably did not care <u>how</u> the concrete got removed and demolished, only that it was done by the least expensive means possible.

Additionally, Defendant provides evidence that part of Plaintiff's inflated estimate derived from his intention to do the actual demolition of the concrete rings himself, at a site that he neither owned nor had permission to use. (Decl. of Bays, Ex. D, Mason Depo at 85:18-86:24.) And, further, that because Plaintiff did not own the demolition equipment he proposed to use, his bid included the renting of expensive machinery which would need to be transported from Ohio. (Decl. of Streadbeck, Ex. B.) Defendants assert – and Plaintiff does not controvert – that they helped him find a less expensive, local alternative to solve this problem. (Decl. of Dixon, Exs. G, H.)

Finally, the reduction in contract price was not only a commercially justifiable step which any responsible project manager would do, but (as discussed *supra*), the reduced scope and price of the work actually ended up netting Plaintiff a greater profit than he would have made on his larger bid. Plaintiff rebuts none of this evidence, nor does he refute the expert testimony offered by Defendant that "STP's actions during the negotiations with Mr. Mason were commercially reasonable, consistent with a contractor's typical practices and appropriate for contract negotiations under the circumstances." (Dkt. No. 107, Decl. of Bays, Ex. K., Purdy Expert Report at ¶ 12.)

B. Payment Delays

WST was required under its contract with STP to complete its close-out documentation and to pay the union for its employees' work, and STP was entitled under the contract to withhold an amount sufficient to satisfy any unpaid obligations of WST. (Decl. of Dixon, Ex. D at 2.) The final payment was only due upon receipt from WST of "an invoice with supporting documentation for the unpaid balance of the subcontract" (id.); i.e., "closeout documentation," which Plaintiff does not deny failing to supply in a timely manner. These are classic "reasonable business justifications," and – other than conclusory assertions unsupported by the evidence that the Teamster claims for payment were "not related to the AWVP project" (Response at 19) – Plaintiff does nothing to refute them.

C. VIN numbers

In order for STP to utilize the contract with WST towards its DBE quota, the regulations required the contractor to be able to certify that the DBE subcontractor owned the trucks it was using:

> Use the following factors in determining whether a DBE trucking company is performing a commercially useful function:… The DBE receives credit for the total value of the transportation services it provides on the contract using trucks it owns, insures, and operates using drivers it employs.

49 C.F.R. § 26.55(d)(3). Plaintiff attempts to refute this requirement by citing only one of five relevant factors (indicating the DBE only had to own one truck), omitting the portion of the regulation quoted above indicating that "DBE credits" are calculated on the basis of the total number of trucks owned; clearly, proof of ownership requires legible VIN numbers, and STP was justified in requiring them and well within its authority as lead contractor to take steps to confirm WSDOT's initial discovery of the obscured VIN numbers on trucks utilized by WST.

It is the finding of this Court that Defendant STP has fully satisfied its burden of establishing commercially reasonable justifications for every action which Plaintiff has attempted to characterize as "adverse" and "retaliatory." Under the McDonnell Douglas framework, the burden then shifts to Plaintiff to establish that the reasons cited above are merely pretextual. Plaintiff , however, comes forward with little except conclusory allegations and repetitious (and unsubstantiated) arguments about Defendants' malevolent designs against him. Plaintiff produces no evidence that any of STP's stated reasons are pretextual, which is not entirely surprising in light of the fact that Plaintiff cannot even establish that Defendants' actions were adverse.

**III.    Motion to strike**

In their reply brief, Defendants also move to strike material in Plaintiff's responsive briefing and its supporting evidence:

1. Plaintiff's response brief quotes an email (which had been received by Plaintiff in late 2016) produced nearly 2 months after the Court closed discovery in November 2018[6] and containing a highly inflammatory (and, Defendants argue, inadmissible) statement about Plaintiff by the Director of DBE Compliance on the Tunnel Project. Defendant argues that the withholding and late production was intentional, but regardless of that, the email was produced after discovery had been closed. The motion to strike is GRANTED.
2. Defendant claims that "large portions" of the Plaintiff's supporting declarations from himself and James Posey should be stricken as containing "hearsay,… legal arguments,

---

[6] "THE COURT: Discovery is over… Plaintiffs are going to be limited to what it is that they have provided." (Decl. of Bays, Ex. A at 28:15-23.)

ORDER ON MOTION FOR SUMMARY JUDGMENT - 13

and… speculation." (Reply at 12.) Whether that is correct or not, Defendants' actual line-by-line objections to the material (and the grounds therefore) are contained in a 32-page document noting their objections in the margins of the declarations. Given that Defendants' reply brief was a full 12 pages, the Court cannot allow them extra pages of argument on their motion to strike. The motion is DENIED, but the parties are reminded that the Court considers only admissible evidence in reaching its factual and legal conclusions.

## Conclusion

Plaintiff has failed to sustain both his burden of producing evidence establishing a *prima facie* case of retaliation, and of demonstrating the Defendants' legitimate business justifications for their actions were pretextual. Defendants' motion for summary judgment is GRANTED, and Plaintiff's remaining state and federal causes of action for retaliation are DISMISSED with prejudice.

The clerk is ordered to provide copies of this order to all counsel.

Dated March 21, 2019.

Marsha J. Pechman
United States Senior District Judge